UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

DEMARIO STEWART
a/k/a Tank,

                              Defendant.

**REPORT AND
RECOMMENDATION**

10-CR-239S

## I.  INTRODUCTION

An immigration detainee housed with defendant DeMario Stewart

("Stewart") alerted the Government that Stewart might be making plans to kill a

witness who would testify against him at trial.  The Government made the

detainee an informant, gave him a recording device, and sent him to elicit

statements from Stewart about possible witness tampering.  The Government

instructed the detainee not to discuss Stewart's main case—this case—but he

ignored the instructions each time and discussed aspects of this case with

Stewart.  The Government never charged Stewart with any new crimes but

wishes to admit the recorded conversations into evidence at the trial for this

case.

Stewart has filed a motion (Dkt. No. 480) to suppress the recorded

conversations.  Stewart objects that the detainee has since been deported and

cannot be confronted about the circumstances surrounding the conversations.

Stewart also argues that the detainee initiated discussions of this case multiple

times and drew statements from him about this case, regardless of how useful the Government considers those statements for trial.  The Government counters that it gave the detainee specific instructions not to discuss this case with Stewart, that the investigation centered on possible new charges, and that the recordings are incriminating only with respect to the issue of witness tampering.

Following a supplemental referral from Judge Skretny specifically to address Stewart's motion (Dkt. No. 550), this Court held a suppression hearing on September 23, 2015.  (Dkt. No. 615.)  For the reasons below, the Court respectfully recommends granting the motion.

## II. BACKGROUND

For the sake of brevity, the Court will assume general familiarity with the case.  The Court instead will focus on the facts that emerged at the suppression hearing.

The events leading up to Stewart's pending motion began as far back as May 2012, in New Jersey.  On May 8, 2012, FBI Special Agent Corey Coleman ("Coleman"), based in Newark, received a letter forwarded from an immigration judge in his area.  The writer of the letter (hereinafter the "Source") was an immigration detainee facing deportation proceedings.  The Source wanted law enforcement to know that he had conversations with another detainee named Aakash Dalal ("Dalal"), who had expressed a desire to blow up federal buildings and to make bombs upon his release.  Coleman never had known the Source up

2

to this point and made arrangements to interview him on May 15, 2012.

Coleman interviewed the Source a second time on June 1, 2012.  At a third

interview on June 25, 2012, Coleman made the Source a confidential informant,

gave him corresponding admonishments, and also gave him a recording device.

The Source subsequently recorded conversations with Dalal that led to new

charges and an increase in bail requirements.  Dalal has remained in custody

since and is aware that the Source cooperated against him.

The Source's work against Dalal prompted transfers for his safety that

would make him relevant to this case.  Immigration agents first made

arrangements to transfer the Source to a different county prison in New Jersey

than the one where he was.  About a week later, immigration agents transferred

the Source to the detention facility in Batavia, New York.  Coleman had nothing

to do with the transfer to Batavia, but the Source occasionally called him to stay

in touch.  Coleman testified that the Source sincerely wanted to "do the right

thing" by passing along potentially helpful information.  At the same time, the

Source was eager to gain favor with immigration agents in a way that would help

him with his deportation proceedings.  Prior to passing along any information

about Stewart, the Source provided Coleman with two leads on other possible

matters that Coleman forwarded to other agencies.

The Source called Coleman on March 27, 2013 with information about

Stewart.  The record does not contain details, but the Source at some point met

Stewart and became aware of the current case against him.  The Source did not

become aware of Stewart's case from Coleman.  When the Source called, he

told Coleman that Stewart was looking to hire him to arrange the murder of a

witness named Shanita Edwards ("Edwards").  From notes that Coleman took,

the Source reported that he would kill Edwards himself away from Buffalo.  The

Source would arrange the details to avoid having any suspicion come back to

Stewart.  Stewart supposedly trusted the Source because they both belonged to

the Bloods gang and would communicate during prison church activities.  The

plan that the Source attributed to Stewart presupposes that the Source would be

released from custody and not deported before Stewart went to trial.  At the time

of the March 27, 2013 telephone call, Coleman had never heard of Stewart or

Edwards but told the Source that he would investigate the plausibility of any

threat to Edwards.  Also at the time of the telephone call, Coleman did not make

the Source an informant against Stewart.  Coleman simply told the Source to

"[c]ontinue to keep your ears open, talk to him [Stewart], and learn whatever [the

Source] could about Shanita Edwards and about this plot."  (Dkt. No. 618 at 21.)

Coleman passed the information that he received on March 27, 2013 to a

supervisor in the FBI field office in Buffalo.  The information eventually made its

way to FBI Special Agent Jason Galle ("Galle").  Coleman had no further

involvement with the investigation of Stewart and learned later that the Source

was deported to Guyana around August 2013.

The information from the Source that made its way to Galle led to the Source's becoming an informant against Stewart.  Galle expressed concern that the Source's information about Edwards and her then-current whereabouts was very accurate.  Galle took steps to ensure Edwards's safety and to begin an investigation into possible witness tampering.  Galle contacted the United States Attorney's Office for this District and worked with a prosecutor other than Joel Violanti, the prosecutor in this case.  Galle and the prosecutor knew that Stewart had counsel for this case but decided that witness tampering would constitute a new charge that did not implicate this case.  Galle also spoke with Edwards, made her aware of the investigation, and gave her advice about protecting herself from any threats.  Most importantly, for purposes of the pending motion, Galle took steps to obtain permission from his agency and the Department of Justice to carry his investigation into the Batavia facility.  This phase of the investigation consisted of making the Source a formal informant against Stewart.  Once Galle obtained the necessary permissions, he and another agent met with the Source, gave him a recording device, and instructed him to meet with Stewart.  Galle told the Source to talk to Stewart about Edwards and his intentions for her, but not to discuss this case.  Galle told the Source that this case could not be a topic of conversation because Stewart had counsel for this case.  For the Source's safety, only the director of the Batavia facility and

perhaps one or two supervising officers were aware of the investigation at the time.

The Source's work as an informant against Stewart led to three conversations.  The first conversation occurred on June 6, 2013 at a facility church service and lasted about an hour.  Galle collected the recording equipment and debriefed the Source after the conversation ended.  In the recording, the Source begins the conversation by telling Stewart that he has new information about Edwards.  Specifically, the Source tells Stewart that Edwards now lives in the New York City area.  The Source then changes the subject to the present case and tells Stewart that "I heard someone talkin bout how you the one that killed some nigga named Brandon." (Hg. Ex. 3 at 2.)[1]  Stewart denies knowing anything about anyone named Brandon and expresses either surprise or disbelief that this case is a topic of conversation in the facility.  Some conversation ensues in which Stewart asks who was talking.  The Source tries to describe the person but doesn't know the person.  The conversation then returns to Edwards.  The Source tries to prompt Stewart by making the most direct statements in the recording; for example, the Source at one point says, "Like, like more or less, the situation, with baby girl and shit I know, she the main key witness in the case, feel me?  So I know what I gotta do, feel me?  So it's like, it

---

[1] The Court will cite as needed to the transcripts that the Government provided at the hearing. The Court has listened to the audio of the conversations and has found minor discrepancies between the audio and the transcript.  For purposes of this Report and Recommendation, however, the transcripts are accurate in all relevant substantive respects.

is what it is, feel me?  I would like somebody to do that shit for me, come through

for me too, if I'm not out there, if I ain't got nobody that's out there for me, feel

me?" (*Id.* at 4.)  Stewart responds with noncommittal statements that

acknowledge the Source's statements without adding extra information about any

plot to kill Edwards.  Toward the end of the conversation, the Source asks

Stewart why he had to go through conspiracy charges if he had nothing to do

with drugs.  (*Id.* at 6.)  Stewart responds that the conspiracy charge is "the only

way to put me in that joint, they gonna put me in every drug transaction." (*Id.*)

After reviewing the recording of the first conversation, Galle became concerned

that the Source was not following his instructions to avoid discussing this case.

The Source carried out a second conversation on or around June 21,

2013.  The Source again received instructions not to discuss this case.

Unfortunately, the recording device malfunctioned, and no recording exists of the

second conversation.

A third conversation occurred on July 16, 2013.  The Source again

received an admonishment not to discuss the present case against Stewart.  In

the recording, however, this case comes up again.  Stewart discusses how he

has been "masterminding" his defense or strategy and how unspecified people

are trying to place blame with him because "I got no record." (Hg. Ex. 5 at 4.)

Stewart and the Source then discuss whether Edwards really is the only person

who could bring about a conviction.  Stewart tells the Source that he will consult

his lawyer about that and then discusses how Edwards has impeached herself with inconsistent statements.  In this key part of the conversation, Stewart makes the most explicit reference to witness tampering and the most analytical statement about evidentiary issues in this case:

> She's gotta, I mean, she gonna have to go.  But see, she already played herself, my lawyer said she's really not a problem, Yo, when you, when you got serious cases like that, you don't, you can't make two statements, you can't say that you seen this person right here, you give a description of the person you seen with your own eyes and then a year later say this is the person you seen with your eyes, you can't do that, that's a conflict of interest.

(*Id.* at 4.)  After the third conversation, Galle again collected the recording device and debriefed the Source.

Witness tampering charges ultimately were not filed against Stewart.  Additionally, Edwards has reported to Galle that no one has made any threats against her or otherwise attempted to contact her about this case.

Stewart makes several arguments in favor of suppressing the recorded conversations.  The Source led the conversations and introduced the topics that he discussed with Stewart.  Stewart makes at least a few obvious references to this case, including references to his counsel.  Stewart argues that the decision not to bring new charges against him weakens the Government's position that the investigation concerned new and unrelated matters.  Finally, Stewart notes that immigration agents, who also are representatives of the Government, made a decision to deport the Source after the third conversation.  Stewart thus cannot

8

authenticate any of the conversations through the Source and cannot confront the Source in any meaningful way.  Stewart argues that he should not face a penalty for a decision that the Government made about deportation.

The Government defends the admissibility of the recorded conversations. The Government notes that Galle carefully obtained the required permissions before sending the Source out for any recorded conversations.  Galle was careful to admonish the Source before each conversation that he could not discuss the present case with Stewart.  The investigation into possible witness tampering does not, according to the Government, do anything to strengthen the present case against Stewart.  In fact, the Government argues that Stewart said nothing incriminating about the present case and declined an opportunity to confirm the identity of a murder victim.

### III. DISCUSSION

Stewart's motion warrants a review of basic principles concerning the Sixth Amendment and possible infringement on an attorney-client relationship.  "The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State. As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right.  The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of

this obligation." *Maine v. Moulton*, 474 U.S. 159, 176 (1985).  "Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Brewer v. Williams*, 430 U.S. 387, 398 (internal quotation marks and citations omitted).  "[O]nce adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." *Id.* at 401; *see also U.S. v. Rommy*, 506 F.3d 108, 135 (2d Cir. 2007) ("Once the right attaches, the Sixth Amendment renders inadmissible in the prosecution's case in chief statements deliberately elicited from a defendant without an express waiver of the right to counsel . . . . [D]eliberate elicitation under the Sixth Amendment covers only those statements obtained as a result of an intentional effort on the part of government officials to secure incriminating statements from the accused.") (internal quotation marks and citations omitted).  A defendant's Sixth Amendment right does not vary with covert or overt interrogation techniques, including the use of informants as opposed to direct interrogation from agents. *See Massiah v. U.S.*, 377 U.S. 201, 206 (1964) (reversing a conviction and holding that "if such a rule is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse") (internal quotation marks and citation omitted); *see*

10

*also Brewer*, 430 U.S. at 400 ("That the incriminating statements were elicited surreptitiously in the Massiah case, and otherwise here, is constitutionally irrelevant.") (citations omitted).

That said, the Sixth Amendment is "offense specific," meaning that law enforcement agents may investigate a pretrial defendant for possible new crimes so long as they do not infringe on the attorney-client relationship that arose for the original crime. *See, e.g., U.S. v. Jacques*, 684 F.3d 324, 331 (2d Cir. 2012) ("Moreover, the government does not violate the Sixth Amendment rights of a defendant charged with a crime by investigating or interrogating that defendant with regard to a separate crime that has not been charged. This is true even where the latter crime is factually related to a charged offense, so long as the offense being investigated is not considered the same offense for the purposes of determining the applicability of the Fifth Amendment's Double Jeopardy Clause.") (internal quotation marks and citations omitted). Instructions to informants can help ensure that no Sixth Amendment violation occurs, but instructions by themselves do not override violations that actually occur. *See U.S. v. Henry*, 447 U.S. 264, 271 (1980) (affirming suppression of evidence where "federal agents instructed Nichols not to question Henry about the robbery. Yet according to his own testimony, Nichols was not a passive listener; rather, he had 'some conversations with Mr. Henry' while he was in jail and

11

Henry's incriminatory statements were 'the product of this conversation.'");
*accord Moulton*, 474 U.S. at 177 n. 14.

The situation presented here comes too close to the situations in *Henry* and *Moulton* to allow the use of the recorded conversations at trial.  The Government intentionally sent the Source to talk to Stewart while equipped with a recording device.  The Government deserves credit for giving the Source instructions not to discuss this case with Stewart.  The Source, however, ignored the instructions during the first conversation and discussed the nature of the conspiracy charge against Stewart.  The Source also tried to bait Stewart into confirming the identity of the murder victim at the heart of the present case.  Confirming the identity of the victim would have required Stewart to acknowledge that there was a murder, which in turn would have forced Stewart to explain how he knew that there was a murder and how he knew the victim's identity.  The Source's conduct during the first conversation was as flagrant a mixing of old and new investigations as any that has ever prompted suppression of evidence.  Additionally, while the Government deserves credit again for repeating its instructions prior to the second and third recorded conversations, it deserves fault for continuing to use an informant who so flagrantly ignored those instructions the first time.  *Cf. Henry*, 447 U.S. at 271 ("Even if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such

12

propinquity likely would lead to that result.").  In fact, the Source ignored the

instructions again during the third conversation, drawing statements from Stewart

that contained an analysis of where he stood given the lack of a record.  The

Source also prompted Stewart to give a well considered, if crude, analysis of

Edwards's credibility under the Federal Rules of Evidence,[2] the same analysis

that the jury will conduct at trial when Edwards testifies.  Under these

circumstances, the only way that the recorded conversations can enter into

evidence at trial is if the Court separates the Government's *intent* not to infringe

on the attorney-client relationship with what actually happened.  The Court

cannot find any authority to support that separation.  *Cf. Moulton*, 474 U.S. at 176

("[K]nowing exploitation by the State of an opportunity to confront the accused

without counsel being present is as much a breach of the State's obligation not to

circumvent the right to the assistance of counsel as is the intentional creation of

such an opportunity.").  That Stewart happens not to have told the Source

anything of great value to the Government about this case does not change the

analysis, given that this case was discussed in some detail on multiple

occasions.

"We do not question that in this case, as in many cases, it was entirely

proper to continue an investigation of the suspected criminal activities of the

---

[2] The Court makes no comment on the accuracy of Stewart's analysis, nor does it wish to imply that he cited the Federal Rules of Evidence.

defendant and his alleged confederates, even though the defendant had already been indicted.  All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial." *Massiah*, 377 U.S. at 207.  The same is true here.  The Government was right to investigate a potentially serious charge of witness tampering.  The Court takes no position on the ultimate decision not to bring new charges.  The Court is recommending only that the Government continue to prepare for trial with the evidence that it developed free of any infringement on Stewart's relationship with his counsel.

## IV. CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting Stewart's motion (Dkt. No. 480) to suppress the conversations recorded in June and July 2013.

## V. OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); Fed R. Crim. P. 59.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives

further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).


SO ORDERED.

_____/s/ Hugh B. Scott_____

HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: October 14, 2015

15